CHARLES W. SMITHERS v. JOHN T. BARKER, Appellant.—111 S. W. (2d) 47.

Division One, December 14, 1937.

*Morrison, Nugent, Wylder & Berger* and *Chas. C. Byers* for appellant.

*Julius C. Shapiro* and *Robert H. Miller* for respondent; *William Goodman* of counsel.

1020

HYDE, C.—This is an action for damages for personal injuries sustained in an automobile collision. Judgment was for plaintiff for $5000. Defendant appealed to the Kansas City Court of Appeals which affirmed the judgment. Upon dissent by one of the judges thereof, the case has been certified here in accordance with the provisions of Section 6, Amendment of 1884 to Article VI of our Constitution. [See 97 S. W. (2d) 121, for these opinions.]

Plaintiff alleged primary negligence charges of defendant's failure to warn, failure to keep his automobile under reasonable control, and excessive speed, and also negligence under the humanitarian rule; but only humanitarian negligence was submitted. Defendant assigns error in overruling his demurrer to the evidence offered at the close of the case. The collision took place shortly after midnight of July 29, 1933, at the intersection of Broadway (a north and south street) and Twentieth Street (an east and west street) in Kansas City. Considering evidence most favorable to plaintiff's contentions, the jury could have found the facts to be as hereinafter stated. Plaintiff drove (with his friend Mr. Sheldon in his automobile) west on

Twentieth Street until he came to Broadway. There were two street car tracks on Broadway and it was designated an arterial or through street. He stopped before entering Broadway with the front end of his car a little west of a stop sign, located near the building line, at the inside (east) edge of the sidewalk. He said that he then saw defendant's car, about a block to the north, coming south, and saw another car, about a half block south, coming north. He then "edged out into the street" (Broadway) about "six or eight feet" and stopped again. The northbound car was traveling "about on the car tracks . . . kind of straddle of one of the car tracks." He waited for it to pass and thereafter did not look south again. (Both of his stops were complete stops.) He then looked north and again saw defendant's car approaching "above the safety zone there." He said that he "would estimate it was 175 feet up there;" that it might have been 200 feet;" that it was "hard to estimate a car coming that way at night, but I would not say it was making over 25 or 26 miles an hour;" and that he "assumed" he "had time and could go across with safety." He said its speed was not "noticeably" increased over the first time he saw it. He started up in low gear, shifted to intermediate, and increased his speed to about eight or ten miles per hour before he reached the point where the cars came together, which he said was after he "was over the street car tracks" and from six to ten feet west of the west rail of the west (southbound) street car track. He said that the front end of his car was about "even with the line of the curb, the west curb" on the west side of Broadway. He said defendant's car was "astraddle" the west rail of the southbound track when he started across Broadway after his second stop, but that it was west of the west line of the safety zone (west of the southbound track) at the time of collision.

Plaintiff further testified:

"Q. And you didn't see him change his course, yourself? A. I did not. Q. Were you asked those questions, and did you give those answers? A. I believe I answered there that I could not watch him always and drive my own car. . . . I was busy driving my car, and looking ahead. Q. You say you saw the Barker car when it was 150 or 200 feet north of you, and the next time you saw it it was right on you. A. Yes. Q. Then, you didn't watch the Barker car while it was traveling a distance of 200 feet? A. I glanced at it, and noticed it. Q. The question was, after you saw it about 200 feet or 150 feet—whatever it was, north of you, after the northbound car had passed, you didn't watch it any more until it was just within a few feet of you, you didn't see it any more? A. I don't think I did." Plaintiff also said: "At ten miles an hour, in second gear, I can stop my car in three feet, or four and a half feet."

An agreed plat showed that Twentieth Street from curb to curb

is a street approximately thirty-seven feet wide; and Broadway, at Twentieth Street is approximately fifty-two feet wide. The safety zone on the west side of Broadway extended sixty-five feet north from the north line of Twentieth street. The west line of the safety zone buttons is five and one-half feet from the west rail of the southbound car tracks; and from the line of these buttons to the west curb line of Broadway, is thirteen and one-tenth feet. The distance from the west rail of the southbound car tracks to the west curb of Broadway is eighteen and six-tenths feet. The street car tracks from the outside rail of the northbound track, is the standard width of fourteen feet and eight inches. The grade on both streets was from four and one-half to five per cent.

Plaintiff's testimony as to speed, distances, stops, starts, and place of collision was corroborated by Sheldon. He was even more definite than plaintiff, saying that at the stop sign stop the northbound car was "in the neighborhood of 100 to 125 feet south of the intersection;" that it was traveling "forty to forty-five miles an hour;" and that defendant's car was then 300 feet north of the intersection. He said that plaintiff's second stop was "six or eight feet from the east curb line" of Broadway; that "he had to stop to let the (northbound) car go by;" and that, when he started up from the stop, defendant's car was "150 feet north of the crossing." He said that when he saw defendant's car just before the collision, it was only about six feet east of the west curb of Broadway; that it was then only twelve to fifteen feet away; and that defendant's car ran on across Twentieth Street about thirty or thirty-five feet (south of the south line of Twentieth Street) before it stopped after the collision. Plaintiff and Sheldon both testified that the right (west) front fender of defendant's car struck the right (north) rear fender of plaintiff's car about where it joined the running board. Both heard "brake noise" or "the squealing of rubber on the pavement" from the action of defendant's brakes just before the collision.

Plaintiff offered portions of defendant's deposition in which he said that he was driving "about twenty or twenty-five miles an hour;" that "going down towards Twentieth Street, my foot was on the brake . . . easing the car down the hill;" that he "was easing my car down the street not to exceed twenty miles;" that his brakes were "first class;" that he "stopped that car that day within three or four feet;" that at the speed he was driving it down there at that time he "did do it;" and at that time and at that place he "could have and did" stop the car "within three or four feet." Defendant's version at the trial (corroborated by Mr. Miller driving behind him) was that as he started down the hill "substantially on the street car tracks" his speed was around twenty miles an hour; that when he got about to the south end of the buttons of the safety

zone at the northwest corner of Twentieth and Broadway, plaintiff's car suddenly appeared coming past the corner of the building located at the northeast corner of the intersection, traveling at a speed of from forty to fifty miles an hour; that when he saw plaintiff's car "flashing into the street" he grabbed his emergency brake, pushed harder on his foot brake, threw his clutch out, and tried to swerve his car to the right, or west, to avoid a direct contact; that he succeeded in swerving his car slightly to the west and succeeded in stopping it completely; that just as he had stopped his car, plaintiff's car struck his left front fender; that plaintiff's car turned over and came to rest about even with the sidewalk at the southwest corner of Twentieth and Broadway; and that defendant's car was brought to a complete stop, with its front end about four or five feet south of the north line of Twentieth Street, with its wheels standing on the street car rails.

Defendant's contention on the demurrer to the evidence is that plaintiff "made no showing whatever that the defendant, after knowing or being able to know that the plaintiff was entering or in a position of peril, could have stopped his car or swerved the same in time to avoid a collision;" that "the only inferences arising from the evidence produced by the plaintiff would be to the effect that the defendant was going at such a rate of speed that he could not have avoided the collision;" and that "plaintiff offered no evidence as to the distance within which the defendant could have stopped his car, other than the defendant's own statement, in his deposition, to the effect that he actually stopped within three or four feet from the north line of Twentieth Street and was at a standstill when the plaintiff's car struck him." Defendant says that plaintiff cannot aid his case by defendant's testimony that he "could have and did" stop his car at that time and place within three or four feet after he put on the brakes, because plaintiff's evidence as to speed of defendant's car contradicted defendant's evidence, and because plaintiff's witness Sheldon contradicted defendant's evidence that he did stop. [Citing Elkin v. St. Louis Public Serv. Co., 335 Mo. 951, 74 S. W. (2d) 600; Pentecost v. St. L. M. B. T. Railroad Co., 334 Mo. 572, 66 S. W. (2d) 533; State ex rel. Weddle v. Trimble, 331 Mo. 1, 52 S. W. (2d) 864; Dilallo v. Lynch, 340 Mo. 82, 101 S. W. (2d) 7.] We fully recognize and reaffirm the rule of these cases, but its application is usually limited to a party's own testimony, because his own statements are conclusive against him unless he corrects or explains them. [Steele v. Kansas City Southern Railroad Co., 265 Mo. 97, 175 S. W. 177.] A plaintiff is not conclusively bound by all of the most unfavorable testimony of his witnesses "where there are other facts and circumstances in the case from which the jury may draw a contrary inference." [Hoffman v. Peerless White Lime Co.,

317 Mo. 86, 296 S. W. 764; see, also, Smith v. Kansas City Public Serv. Co., 328 Mo. 979, 43 S. W. (2d) 548.] He may have the benefit of facts favorable to him, developed by defendant's evidence, which his own statements do not contradict and which is not contradictory to the fundamental theory of his case. [Elkin v. St. Louis Public Serv. Co., supra; Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950.] Certainly testimony that defendant "could have stopped" his car within three or four feet did not conflict with plaintiff's theory of recovery. Plaintiff did not himself say that defendant's car did not stop at or near the point of collision; and all the evidence showed that the damage to defendant's car was very slight, indicating glancing rather than direct impact.

Certainly there was no directly contradictory evidence as to the speed of defendant's car. None of the evidence was any more than approximate estimates. Defendant's lowest estimate was between fifteen and twenty miles per hour. Miller, driving behind defendant, said he was driving his own car "around 25 miles an hour." Sheldon said he did not know how fast defendant's car was going at the time of plaintiff's second stop; that "coming straight at you, you could not tell the speed;" that he would "judge 25 miles an hour" when it was twelve or fifteen feet away; and that this was his estimate and was "about right." Plaintiff said, as to defendant's speed, at the time he made the second stop, that it was "hard to estimate a car coming that way in the night but I would not say it was making over 25 or 26 miles an hour, something like that." Although we consider that there was a narrow zone of peril in this case (because plaintiff knew of the near and rapid approach of defendant's car), nevertheless since an automobile can be swerved or its speed slackened in less space than it can be completely stopped (Steger v. Meehan (Mo.), 63 S. W. (2d) 109), we hold that plaintiff's version of the facts, aided by defendant's statement of his ability to stop and actual stopping at such speed as he did travel, to be sufficient to make a jury case of humanitarian negligence. We, therefore, hold that there was no error in overruling defendant's demurrer to the evidence.

■ Defendant also assigns error in plaintiff's Instruction No. 1, authorizing a verdict on humanitarian negligence, on the ground that it informed the jury that plaintiff entered a position of peril at the time he entered the intersection. Before discussing this instruction we note that plaintiff, by additional brief, cites Perkins v. Terminal Railroad Assn., 340 Mo. 868, 102 S. W. (2d) 915, as authority for the language used in this instruction. However, the Perkins case is not applicable here because an entirely different fact situation was involved. In the Perkins case this court (en banc) unanimously concurred in ruling that the plaintiff therein made a humanitarian negligence case, based on peril while approaching a

railroad track oblivious to an oncoming train, which plaintiff said he did not see and which his evidence showed was running at night without lights. The disagreement in that case was as to whether a specific finding of obliviousness was an essential element of plaintiff's instruction authorizing a verdict. (Such a finding was specifically required as essential to a verdict for plaintiff by defendant's instructions.) The Perkins case does not authorize a misstatement as to where a position of imminent peril begins, under the facts of a case; and that is the charge made against this instruction.

Plaintiff's Instruction No. 1, herein, authorized a verdict if the jury found negligence, as direct result of which plaintiff was injured, from the following facts (leaving out "if so," etc.) hypothesized by the instruction, to-wit:

"If you find and believe from the evidence that (on date stated), and while plaintiff was driving and operating his Chevrolet automobile *at, upon and across the intersection* (of streets designated), and that at said time and place, plaintiff was in a position of imminent peril and danger of being struck by or colliding with the Cadillac automobile, driven by defendant, John T. Barker, and that plaintiff was oblivious thereof, or was unable to extricate himself therefrom, and if you further find from the evidence that said *defendant* John T. Barker, *saw or* by the exercise of the highest degree of care, *could have seen the automobile,* which plaintiff was driving, *entering into, upon and crossing said intersection,* and in a position of imminent peril, at said time and place, in time thereafter, by the exercise of the highest degree of care on the part of said defendant, John T. Barker, with the means and appliances at hand, and with safety to himself, and said Cadillac automobile, he could have stopped said Cadillac automobile, or have slackened the speed thereof, and failed so to do, and that by either stopping same or slackening the speed thereof, the defendant could have averted or avoided the striking together of said automobiles, and said collision and injuries, if any, to plaintiff." (Italics and parentheses ours.)

We consider this instruction to be misleading and erroneous because, by ignoring plaintiff's own evidence of his stop in the intersection, (by the italicized portions thereof) it could reasonably be construed to place a duty to act upon defendant (and to say that failure to so act was negligence) before plaintiff could possibly have been in any peril whatever from defendant's car. Under plaintiff's own evidence, he was not in any position of peril (even from the northbound car which was then closer to him than defendant's car by at least the width of the street car tracks) when he was *"entering into"* and *"upon"* said intersection, because after entering into and upon said intersection he was still in a place in which he could and did stop in complete safety from all traffic. The misleading and

erroneous character of the language used, as applied to plaintiff's evidence herein, is shown by rearranging its wording, thus: "If you further find from the evidence that . . . by the exercise of the highest degree of care . . . defendant . . . could have stopped said Cadillac automobile, or have slackened the speed thereof . . . and that by either stopping same or slackening the speed thereof, *defendant could have averted or avoided the striking together of said automobiles*" after "*defendant saw* or by the exercise of the highest degree of care could have seen *the automobile, which plaintiff was driving, entering into,* upon and crossing *said intersection.*" This was in effect saying to the jury that if plaintiff was anywhere, in this intersection, he was in a position of imminent peril. Of course, defendant could have "avoided the striking together of said automobiles" by stopping or slackening the speed of his car, giving plaintiff the whole right of way across this arterial street, and waiting for him to cross before proceeding further, at the instant he saw or could have seen plaintiff's car "entering into" said intersection. Nevertheless, his failure to do so *then* could not make a humanitarian negligence case against him because plaintiff was not in a position of any peril from defendant's car when it was slowly ("edged out into the street" according to plaintiff's evidence) "entering into" and "upon" the intersection. Defendant's humanitarian duty did not commence at his first sight of plaintiff's car, if it was moving as plaintiff said it did.

Moreover, under plaintiff's evidence, defendant's duty under the humanitarian rule did not even commence immediately, when plaintiff, after his second stop (first in the intersection), again started "*crossing said intersection*" because the reasonable appearance of the situation did not then immediately show him to be in peril and the actual facts showed he was not.

First: (*Reasonable appearances*) Assuming defendant to see plaintiff doing everything he said he did, what he would have seen was this: Plaintiff, after stopping at the edge of the intersection, drove slowly out into the intersection six or eight feet and stopped again, before reaching the path of northbound traffic, to let a northbound car pass; then he started again in low gear from a complete stop. At the highest speed he attained he could stop in three or four feet. Evidently he could have stopped within less space before he shifted to second, and he was at least twenty feet from defendant's path when he started the second time. Certainly from the reasonable appearances of these movements, it would be reasonable for defendant to assume that plaintiff was carefully observing traffic, had his car under complete control, and intended to stop again before he reached the path of southbound traffic. Certainly defendant's humanitarian duty did not arise until, from nearer approach and in-

creasing speed, the reasonable appearances of the situation made it apparent that plaintiff intended to continue all the way across and into defendant's path. [Womack v. Missouri Pacific Railroad Co., 337 Mo. 1160, 88 S. W. (2d) 368; Elkin v. St. Louis Public Service Co., supra; Allen v. Kessler (Mo.), 64 S. W. (2d) 630.]

Second: (*Actual facts*) Plaintiff was not oblivious (obliviousness should not have been submitted in the alternative as an element of peril) because he said that he knew defendant's car was approaching, and had twice fully observed its approach. When he again started toward its path, he knew it was rapidly approaching, because it had then covered half the distance between the intersection and where he first observed it. With ability to stop his car within three or four feet, he traveled from twenty to twenty-five feet, according to his own theory, before he got into defendant's path. Certainly no man should be heard to say, merely because his timing was bad, that he was oblivious of the approach of an automobile or of the danger of a collision therewith, when he had first seen it a block away, observed it again thereafter at half that distance, and therefore knew of its near and rapid approach; and had stopped (when he first observed defendant's car) for another car which was also half a block from him when he started towards its path. Conceding plaintiff did not know that defendant's car would go to the west of the safety zone, this change of direction took place *after* plaintiff had started from his second stop, so that no danger zone then extended to his starting place. This is not like a case where the driver saw the vehicle or instrumentality that struck him but did not know it was moving (Larey v. M. K. & T. Railroad Co., 333 Mo. 949, 64 S. W. (2d) 681; Schneider v. Terminal Railroad Assn., 341 Mo. 430, 107 S. W. (2d) 787; or where the oncoming vehicle suddenly increased its speed. [Larey v. M., K. & T. Railroad Co., supra; Pence v. Kansas City Laundry Service Co., 332 Mo. 930, 59 S. W. (2d) 633.] We agree with the Court of Appeals (97 S. W. (2d) 1. c. 124) that "the case was tried as though respondent's obliviousness was not an element in the case," but this instruction authorized the extension of the zone of peril further than anything except obliviousness could extend it.

Certainly when a person knowing of the near approach of an oncoming vehicle deliberately (with ability to stop) goes into its path, either definitely or in an attempt to take the right of way or "to beat it across" or otherwise acting to place all responsibility for avoiding contact upon the operator of such vehicle, the zone of his peril is very narrow and the duty of such operator to act does not commence until such person is actually in its path or so close to it that it is apparent (at the rate of speed and manner he is moving) that he will not stop before reaching it. [Lamoreux v. St. L.-S. F.

1028

Railroad Co., 337 Mo. 1028, 87 S. W. (2d) 640; Wallace v. St. J. Ry., L. H. & P. Co., 336 Mo. 282, 77 S. W. (2d) 1011; Stanton v. Jones, 332 Mo. 631, 59 S. W. (2d) 648; McGowan v. Wells, 324 Mo. 652, 24 S. W. (2d) 633; Sullivan v. A. T. & S. F. Railroad Co., 317 Mo. 996, 297 S. W. 945; State ex rel. Wabash Railroad Co. v. Bland, 313 Mo. 246, 281 S. W. 690.] This is because a person, who is not oblivious and has the ability to stop, is not in a position of any peril whatever (certainly not imminent peril) when he is merely moving toward the path of a moving vehicle, and he does not come into a position of imminent peril therefrom until he is directly in the path of such vehicle or so close thereto that he cannot stop short of its path. [Lamoreux v. St. L.-S. F. Railroad Co., supra; Elkin v. St. Louis Public Service Co., supra; Ziegelmeier v. E. St. L. & S. Railroad Co., 330 Mo. 1013, 51 S. W. (2d) 1027; Cavey v. St. J. Ry., L. H. & P. Co., 331 Mo. 882, 55 S. W. (2d) 438; (or even if he is in its path with ability and time to get out of it, Clark v. A. T. & S. F. Railroad Co., 319 Mo. 865, 6 S. W. (2d) 954.] The only kind of a humanitarian case plaintiff could make, under the *actual facts* that he stated, was one in which plaintiff's position of imminent peril began and defendant's duty arose after he came into the path of defendant's car or so near thereto that he was then unable to keep from going on into it. We, therefore, hold that it was prejudicial error to submit a position of peril and a duty upon defendant to act everywhere and at all times after plaintiff's car was "entering into, upon and crossing said intersection."

Defendant also makes complaint as to the final paragraph of this instruction, which after authorizing a verdict for plaintiff upon finding the facts, hereinabove set out, continued as follows:

"And, you are further instructed, this is so, even though you should find and believe from the evidence, that plaintiff did not exercise due care for his own safety, and was, or was not, then and there drunk and negligent, in getting himself into the aforesaid position of imminent peril, if any, at said time and place."

We consider it to be proper in a humanitarian negligence case to inform the jury that contributory negligence of plaintiff is not a defense or that negligence of plaintiff which only contributed to or concurred in his injury does not defeat his recovery. [Dilallo v. Lynch, 340 Mo. 82, 101 S. W. (2d) 7.] However, we cannot approve the language of this instruction in this case because, under defendant's evidence, the jury would have been warranted in finding that plaintiff's negligence was the sole cause of his injury. Accepting the facts that defendant's evidence would show, it would be difficult to conceive of a clearer sole cause case. The broad language above set out would be in conflict with a proper sole cause instruction. Since this case must be retried, we hold that defendant on his evidence was en-

titled to a sole cause instruction; but we do not approve the one requested, which did not hypothesize the facts shown by defendant's evidence and submitted negligence which would have been only a concurring cause under plaintiff's version of the facts. The requirements of a proper sole cause instruction have recently been restated by this court in McGrath v. Meyers, 341 Mo. 412, 107 S. W. 792, decided concurrently herewith, and in Dilallo v. Lynch, supra.

The judgment is reversed and the cause remanded. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.