HALLIE C. LEAVELL, RESPONDENT, v. GUY A. THOMPSON, TRUSTEE, APPELLANT.—176 S. W. (2d) 854.

Kansas City Court of Appeals.  December 6, 1943.

*Thos. J. Cole, L. J. Bishop, D. C. Chastain* and *Patterson, Chastain & Smith* for appellant.

*Poague & Poague* and *Crouch & Crouch* for respondent.

134

BLAND, J.—Hallie Leavell, plaintiff below, sued Guy A. Thompson, Trustee of the Missouri Pacific Railroad Company, a corporation, defendant, for damages resulting from injuries received by him when his motor car, which he was operating, was struck by one of defendant's trains. From a verdict and judgment in favor of plaintiff in the sum of $2500 defendant prosecutes this appeal.

Defendant offered no evidence but stood on demurrer which it urges in this appeal. In passing on the demurrer we will consider the evidence from a standpoint most favorable to plaintiff.

Plaintiff was a farmer, some thirty-four years of age. He was driving his Chevrolet sedan along a street in the town of Archie, Missouri, with the windows closed, shortly after noon when the collision occurred. The sun was shining and it was a perfect winter day, but the streets and roads were covered with snow and ice and were slick. Plaintiff testified that he knew of this situation and knew that, on account thereof, his brakes did not perform very well; that he could not have driven much slower and "still stay in high gear." As the car approached the railroad crossing it was proceeding at a rate of ten to twelve miles per hour. Plaintiff had just deposited some cream

cans at defendant's station and was proceeding homeward. Plaintiff knew that defendant's passenger train, the one that struck his car, was due to arrive and that it had not yet arrived. He was looking and listening intently for sight and sound of the train. His view of the track was obstructed by a dense and high growth of brush and trees on land adjoining, but not on, the right of way, so that he could not see the approach of the train until he cleared said obstruction, which was at a point about fifty feet from the crossing where the collision occurred. The train was coasting down grade at a speed of about eight miles per hour. The train was stopped within forty feet after the collision.

Plaintiff testified that when he cleared the obstruction so that he could see down the track in the direction from which the train was coming he saw the engine at a point about 110 feet from the crossing; that the automobile was then fifty feet from the track; that the whistle of the train was not sounded nor was the bell rung; that he, at that time, applied the brakes on his automobile; that the automobile was equipped with four wheel brakes which had been relined, shortly prior thereto, and were in good condition; that the brakes "took hold" at once and the wheels skidded on the snow and ice, in a straight line, from that point until the car reached the approach to the crossing; that it then skidded up a four foot grade, and the front wheels came to rest on the tracks; that he put the automobile in reverse in an effort to stop; that the engine struck the car and pushed the front end around and off the grade, a distance of some fifteen feet, and that he was injured as a result of the collision.

Chester Mawson testified to the effect: that he was in the office of an elevator located some sixty feet across the tracks from where the collision occurred; that he saw the train approach; that it was coasting down grade at a speed of about eight miles per hour; that the whistle was not blown nor was the bell sounded; that he was looking at the bell and that it was not in motion; that he saw the train come to a stop but did not see the collision, although he went to the scene immediately afterward; that when the train was stopped the engine and tender were north of the crossing and the baggage car was half way across.

Alonzo Mawson and H. O. Bosley, partners of Chester Mawson in the elevator business, also testified. Their testimony was about the same as that given by Chester Mawson. They stated that they observed the train as it approached the crossing and heard no bell or whistle. Bosley testified that there was "quite heavy traffic on that street."

Clifton Morrison, who was riding in plaintiff's car at the time of the collision, gave testimony substantially the same as that given by plaintiff, excepting that he said that the automobile was twenty-five or thirty feet and that the engine was about fifty feet from the cross-

ing when he first saw it, and when the brakes were applied and the car began to skid. He heard no whistle or bell although he was vigilant and was listening and looking for a train when the car approached the crossing.

Murat Cramer, a rural mail carrier, testified that he was at defendant's station to get the mail from this train; that he saw' it when it came within view, south of the station, and observed its approach until the collision occurred; and that he did not see the collision, some 450 feet from him. He stated that no whistle or bell was sounded.

James M. Smith, fireman on the train, was a witness for plaintiff. He testified that the train approached the crossing down grade, coasting, at a speed of about eight miles per hour; that the automatic bell was ringing; that he observed plaintiff's car as it approached the crossing; that the train could have been stopped at that time within a distance of from forty to fifty feet; that when he first observed plaintiff's car it was about fifty feet from the crossing and was proceeding in the ordinary manner; that when the car reached a point from ten to fifteen feet from the track it began to skid; that witness then shouted to the engineer and he applied the brakes on the train; that the train was stopped within a distance of forty feet after he signaled the engineer; that the engine was from thirty-five to forty feet in length and the tender from fifteen to twenty feet long; that the train's speed was not varied from about eight miles per hour, from the place where it came over the grade, south of Archie, or from a point more than 300 feet south of the crossing, until he signaled the engineer to stop; and that, immediately after the collision plaintiff told him that it was his, plaintiff's fault, that: ''. . . he saw us coming, but he couldn't stop, the car was sliding, which it was, and there was nothing hurt . . . ''. He did not testify regarding the sounding of the whistle. The case was submitted to the jury under instructions which permitted recovery for both primary and humanitarian negligence. Defendant's first contention is that no submissible case was made on primary negligence because plaintiff was guilty of contributory negligence as a matter of law and because the slippery condition of the street caused by snow and ice, was the proximate cause of the collision.

It is noted that plaintiff testified that he was looking and listening for the approach of the train that struck his car and that he saw it when his automobile was fifty feet from the crossing. His brakes were in good condition and he applied them immediately. The automobile skidded from that point and upon the crossing. Defendant contends that, had it not been for the snow and ice which caused the wheels to skid, the automobile could have been stopped within much less space than fifty feet.

We said in Cross v. Wears, 67 S. W. (2d) 517, 518:

"In the case of Spoeneman v. Uhri (Mo.), 60 S. W. (2d) 9, 12, the court said that it was 'a matter of common knowledge that automobiles of all makes going twenty miles per hour can be stopped in twenty or twenty-five feet and going twelve miles per hour in twelve or fifteen feet.' "

In the case at bar the automobile, in order to reach defendant's tracks, skidded up grade for some distance on to said tracks. We may, therefore, assume in this case, that had the street been dry and free from snow and ice, the automobile, proceeding as it was, under the circumstances shown here, could have been stopped within at least twelve feet after the application of the brakes.

We think that defendant's failure to warn plaintiff of the approach of the train contributed to the collision as, at least, one of the proximate causes thereof. Plaintiff knew that the road was icy and slick and was listening intently for the approach of the train, which he knew was due, as he passed along the obstruction that prevented his seeing its approach. The jury could have reasonably inferred that a sudden blast of the whistle would have been heard, heeded and acted upon by plaintiff at that time. [Chawkley v. Wab. Ry. Co., 297 S. W. 20, 24; Gann v. Chi. R. I. & Pac. Ry. Co., 6 S. W. (2d) 39, 43.] Ordinarily, the question of proximate cause is one for the jury (Cech v. Mallinckrodt Chem. Co., 20 S. W. (2d) 509), and in this case we think it was a question for the jury to determine whether the failure of the defendant's agents to give a timely warning concurred at least as one of the proximate causes to bring about the collision. [Williams v. Thompson, 166 S. W. (2d) 785; Sisk v. Chi. B. & Q. R. Co., 67 S. W. (2d) 830.]

However, defendant contends that the facts in the Williams and Sisk cases are different from those in the case at bar. As the facts in no two cases of this kind are identical, it follows that the facts in the present case are not the same as in those two cases. However, there is not a sufficient variation in the facts as to make them inapplicable. It is said that, in the case at bar, the slick condition of the highway was not shown to have been known to the fireman. The evidence shows that the place where plaintiff's car skidded was not only slick but that there had been a large snow fall in the vicinity. There was, also, evidence that there was ice and snow on other roads in the vicinity. In fact it would be a freak of nature for ice and snow to be upon the road in question between the end of the obstruction and the tracks and not appear anywhere else. The jury could have inferred that the operators of the train saw the general icy condition if, it was not, as a matter of law, their duty to see it. [Dutcher v. Wab. R. Co., 241 Mo. 137, 165.]

However, defendant says that the Williams and Sisk cases are in conflict with the cases of DeMoss v. K. C. Rys. Co., 296 Mo. 526, and Wood v. Wells, 270 S. W. 332, decided by the Supreme Court. The

138

DeMoss and Wood cases were distinguished in the Williams and Sisk cases on the ground that in the Wood and DeMoss cases, the plaintiff saw the street car before he reached a position where the automobile could not have been stopped short of the danger zone. Plaintiff having knowledge of the presence of the street cars in those cases the failure to warn of their presence could not have been the proximate cause of the collision.

Defendant insists that there is nothing in the Wood and DeMoss cases on which to base any such distinction. We think that a fair consideration of what was held in those cases shows to the contrary and that they were properly construed in the Williams and Sisk cases.

However, it is insisted that plaintiff was guilty of contributory negligence, as a matter of law. We are unable to agree with this contention. Plaintiff gave himself at least four times the distance required to stop under ordinary conditions, that is, when the street was dry. See Sisk v. Chi. B. & Q. R. Co., *supra*, l. c. 836, where the court said: "The error on plaintiff's part was that he did not succeed in reducing his speed to the point that he could stop upon the slippery pavement before going upon the tracks after the train came into view. However, he did recognize this duty on his part and attempted to fulfill it. He gave himself *twice* the distance that would have been required upon dry pavement, which proved, incidently, not to be enough. But this error was merely one of judgment, and not a disregard of his own safety. All the facts and circumstances considered, could it be said that reasonable minds would all agree that he failed to exercise due care to observe and avoid danger? We think not. At most there could be no more than an honest difference of opinion upon the question, which, after all, is but another way of saying that the issue was one for the jury to determine." (Italics ours.)

We have examined the cases of Borrson v. M.-K.-T. R. Co., 172 S. W. (2d) 835, and State ex rel. v. Hughes, 153 S. W. (2d) 46, and like cases cited by defendant and find the facts therein to be so different from those in the case at bar as to render them of no aid to the defendant.

Defendant also contends that a submissible case under the humanitarian rule was not made. In determining this question we shall accept as true all the evidence which tends to establish facts most favorable to plaintiff's theory, and we will reject all evidence unfavorable to him; but we cannot accept as true such evidence as is contradictory of the established physical facts of the case.

Plaintiff was traveling at a speed of ten miles per hour when he reached a point fifty feet from the crossing and there, for the first time, saw the train approaching. The train, according to all of the testimony, was proceeding at a speed of eight or nine miles per hour. We will accept eight miles as its speed. Plaintiff applied his brakes

immediately and they took hold instantaneously, causing the automobile to begin skidding toward the crossing. Defendant's fireman testified that he saw the automobile when it cleared the obstruction, fifty feet from the track; but he testified that it did not begin to skid until it was about fifteen feet from the crossing. The jury could, and we assume that it did, believe the fireman's testimony to the effect that he saw the automobile when it was fifty feet from the crossing, and that he saw it skidding on the ice and snow; but the jury had a right to, and no doubt did, disbelieve his testimony to the effect that he did not see the automobile skidding when it was fifty feet from the crossing. [Cook v. St. Joseph Light, Heat & Power Company, 106 S. W. (2d) 38, l. c. 44.] Plaintiff said it was skidding at that point and, after verdict, we must assume that statement to be true. The fireman saw the automobile at that time and, since it was skidding, he must also have seen that it was skidding. At least the jury could have so believed and found.

The car was proceeding at a rate of speed of ten miles per hour when the brakes were applied and *it stopped with the front wheels over the first rail of the track*. It was fifty feet from the point where the brakes were applied to the first rail; so the car must have traversed more than fifty feet or, at least, fifty-two feet at the time it came to a stop.

Defendant says that because plaintiff, in his statement given to the defendant, two days after the collision, asserted that the car finally stopped just short of the tracks and was hit by the overhang of the engine at the front wheel and hub cap of the car, and that plaintiff testified at the trial that his statement was correct, plaintiff is conclusively bound by what he said in his statement, and he cannot rely upon his testimony given at the trial, that his front wheel stopped over the first rail of the track.

There was no attempt made to explain the difference between what was said in the statement and plaintiff's testimony, at the trial; but we do not think it can be said, conclusively, that plaintiff admitted at the trial that what he said in his statement was true. He testified: "Q. You remember reading it? A. Yes, sir. Q. And signing that and saying that that was true? A. Yes, sir." It will thus be seen that plaintiff testified that he said *in his statement* that what was there disclosed was true; but he did not say, *at the trial,* that what he said in his statement was true. The conflict between the statement and plaintiff's testimony at the trial was a question for the jury. [Braden v. Floor & Wall Tile Co., 223 Mo. App. 700.]

So we have a situation of a car proceeding at the rate of ten miles per hour, skidding uphill and stopping in approximately fifty-two feet. There is evidence, also, that the car came to a stop before it was struck but that the stopping and the collision were almost instantaneous. So there was some lapsation of time, not long to be sure,

between the time the car was stopped and the time it was struck. A car going at the rate of ten miles per hour when the brakes were applied, and coming to a stop after proceeding fifty-two feet and, in the meantime, going uphill, must have moved at an average rate of speed of less than ten miles per hour, and the jury could have found, as a matter of fact, that it covered the fifty-two foot space at an average rate of speed slower than that at which the train was proceeding (eight miles per hour). As the train was actually stopped within forty feet, it can readily be seen that it was a question for the jury to determine whether the fireman saw plaintiff in an inextricable position of peril in time to have taken action to cause the train to have stopped in time to have avoided the collision. [Brown v. Alton R. Co., 151 S. W. (2d) 727.]

It is true that plaintiff estimated that the train was from 100 to 110 feet from the crossing when he cleared the obstruction, and that the witness Morrison estimated it to be fifty feet from the crossing when the automobile was twenty-five feet therefrom, at which point, he stated, the brakes were applied; but these statements of both plaintiff and Morrison were mere estimates of distances and were made when both parties were under great stress. All witnesses virtually agreed on the rate of speed at which the automobile and the train were traveling. We may compute the distance in accordance with such facts as are established by evidence when, by so doing, plaintiff's right of recovery is aided.

The amended petition alleges: "That while plaintiff was *immediately* approaching and nearing and in imminent peril and danger of being struck and injured by said train, defendant, his agents and employees knew or could have known thereof in time, by the use of due care and the means at hand, and with safety to said train and those on it, to have slackened the speed thereof or stop said train or give timely warning of the proximity of such peril and danger and thereby avoided any injury and damage to the plaintiff, but failed to do so and defendant, his agents, servants and employees negligently and carelessly caused and permitted said train as it *immediately* approached and neared said crossing to be operated at a high, reckless, dangerous and exorbitant rate of speed and negligently failed to sound or give reasonably sufficient warning or to give reasonable and sufficient or legal warning to the plaintiff." (Italics ours.)

Defendant insists that plaintiff cannot recover on the theory that the train was running at the rate of eight miles per hour when the petition bases his right of recovery on an allegation of a high, excessive and exorbitant rate of speed. We notice that the petition not only alleges the rate of speed last mentioned but also alleges, to the effect, that the train was being run at such a rate of speed that it could have been stopped or the speed thereof slackened after plaintiff's peril arose. Defendant does not claim any inconsistency be-

tween the two allegations but this, perhaps, is the effect of the contention. In other words, one allegation cancels out the other and the whole constitutes a *felo de se*. [See Raming v. Met. St. Rys. Co., 157 Mo. 477, 508.] We think defendant is in error in its contention. What is a high and reckless rate of speed under one set of circumstances might not be under another. Such allegations as are contained in the petition herein are not necessarily inconsistent. [See Benson v. Smith, 38 S. W. (2d) 743, 746, and cases there cited.] We need not pass upon the question as to whether defendant's proper course would have been a motion to elect, if the two allegations had been, in fact, inconsistent.

Defendant insists that the court erred in giving plaintiff's instructions "A" and "B". These instructions submit a violation of Section 5213, Revised Statutes Missouri 1939, relating to the sounding of a whistle or the ringing of a bell eighty rods from the crossing of a traveled public road or street. Defendant insists that there is no allegation in the petition sufficient to submit a violation of the statute and, therefore, its submission was improper. We have already quoted pertinent allegations of the petition and must rule that there is no merit in the contention. [See Mayer v. Chi. & Al. R. Co., 198 S. W. 839, 841, 842.] We have examined the case of Terry v. The St. Louis & San Francisco Ry. Co., 89 Mo. 586, cited by the defendant and find it not in point. Defendant calls our attention to the allegation in the petition that defendant was negligent in failing to give a warning of the presence of the train *immediately* as it "approached and neared" the crossing and says that "immediately" does not mean eighty rods from the crossing. We are of the opinion that the word "immediately" refers to the rate of speed used, not to the time the warning should have been given. This view of the petition is made more manifest by the fact that negligence in failure to warn is charged in two places in the petition. The first in connection with the humanitarian clause where it is alleged that plaintiff was *immediately* approaching a position of imminent peril, etc., and in the second, in connection with the allegation of primary negligence, where it is charged that defendant failed to give a warning *as the train* approached the crossing. It was evidently the intention of the pleader to charge that defendant should have given two warnings, one as plaintiff approached a position of peril and another, before that time. The word immediately is a relative term at most.

Defendant insists that it was error for the court to give plaintiff's Instruction "C". Said instruction is as follows:

"The court instructs the jury that if you find and believe from all the evidence that on January 11, 1940, plaintiff was driving his automobile eastward on Pine Street in Archie, Missouri, near the tracks of the defendant and defendant, its agents and employees, were operating a train northward toward said crossing and that prior to the

collision of said train and the plaintiff's car plaintiff was in a position of imminent peril and danger of being struck by said train and unable to extricate himself from such peril and danger, if you so find he was in imminent peril and danger, and that the defendant, his agents and employees, in charge of the operation of said train, saw or could have seen, by the exercise of ordinary care, plaintiff in such position of imminent peril and danger, if you so find, in time thereafter and with the means at their command and with safety to themselves, the train and those on the train to have stopped said train and thus prevented the collision and injury, if any, to plaintiff and failed to do so, then defendant was negligent, and if you find that such negligence, if you so find, of defendant directly caused the injuries, if any, to plaintiff, then you will find the issues for the plaintiff and against the defendant, *and this is the law even though plaintiff was himself negligent in getting into such position of imminent peril and danger, if so.*" (Italics ours.)

The instruction is criticised because: "It did not require a finding, and there was no evidence on the point, that the train could have been stopped after the position of peril of the plaintiff became apparent and the collision prevented with safety to the train." Defendant relied on Burge v. Wabash Railway Company, 244 Mo. 76, to support this contention. That case is nowhere else cited or mentioned in defendant's brief. However, the instruction does specifically require such a finding and defendant's fireman testified (and his testimony in this regard is uncontradicted), that the train was actually stopped within forty feet after he signaled to the engineer. The point is without merit.

The instruction is further criticised on the ground that it conflicts with any proper sole cause instruction to which defendant may have been entitled under his theory of the case. Defendant relies on Smithers v. Barker, 111 S. W. (2d) 47, for support of its position. The Supreme Court held in that case, l. c. 53, that the instruction, which was there under consideration and which possessed a "tail" similar to the one here considered, was erroneous because it would conflict with a proper "sole cause" instruction; and that there was sufficient evidence in the case to support a properly drawn "sole cause" instruction.

What was said in Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2d) 47, is not controlling here because the instruction in the case at bar differs vitally from the one there ruled. It will be noted in the case at bar the jury was told: "and if you find that such negligence . . . of defendant directly caused the injuries . . . " In a decision rendered after Smithers v. Barker, *supra*, the Supreme Court said: "Of course, if the jury found that the injuries were the *direct result* of defendant's negligence, they couldn't find that they were due to the sole negligence of plaintiff. In that sense, plaintiff's instruction

would be the converse of a "sole cause" instruction, but it would not prevent defendant from properly submitting his theory of sole cause". [State ex rel. Snider v. Shain et al., 137 S. W. (2d) 527, l. c. 530.] The instruction is not erroneous on the grounds assigned.

However, defendant insists that the verdict and judgment are excessive.

The evidence in this connection shows that plaintiff at first thought that he had received no injury and, in effect, so told the fireman immediately after the collision, and so stated in his statement given to the defendant two days thereafter.

However, plaintiff testified that a day or two after the collision his back started hurting him worse. He went to see a Dr. Griffith three or four days after the collision, complaining of his back hurting him, and the physician, from his examination, found plaintiff had a limited movement in his back when he bent forward; that it pained him about the eighth or ninth dorsal vertebra. Dr. Griffith attempted to cure plaintiff by medicine, which proved to be ineffective, and in about two or three weeks he strapped up plaintiff's back. This did not help plaintiff's condition, so, the doctor caused an X-ray to be taken of his back. The X-ray disclosed no breaks or fractures of any kind, but the doctor was satisfied that plaintiff had suffered a strained back and the doctor prescribed a brace.

The doctor further testified that plaintiff at the trial was suffering from a vertebral ligament strain; that plaintiff's condition will improve to a certain extent if plaintiff wears his brace; that "I would say he has about thirty percent disability, will always have thirty percent disability."

Dr. Mueller, testifying for plaintiff, stated that he took an X-ray of plaintiff's back and that this disclosed calcification or deposit of bone in the ligaments between the eighth and ninth dorsal vertebra; that, "in the absence of any arthritis findings any place else in the spine, is due to injury, that is ligaments over stretched or torn and blood forms in the ligaments and that blood is changed to calcium. Q. If a person receives a sudden wrench or a striking of that region, whereby the ligaments are torn, will there be a hemorrhage in those ligaments? A. Yes, sir. Q. And what does nature do to remedy that situation? A. Well, if the hemorrhage is not extensive, nature sometimes absorbs that hemorrhage, if it is not, it remains there and finally becomes bone. Q. And that is what you mean by the calcium deposit, it is a little extra bone that nature has formed in there? A. Yes, sir. . . . Well, the ligaments, of course, bind or hold the vertebra together, and there is some degree of flexibility in every normal spine. After a severe injury, the ligaments become less elastic, as is shown by the calcium deposit, and that is a permanent condition."

The evidence shows that plaintiff suffers from lumbago, but the injuries suffered in the collision are in no way connected with his

144

lumbago; that his injuries caused plaintiff to suffer several months of continuous and intense pain; that he was able to do but little work. He testified that about three months after the injury a very uncomfortable and irritating back brace was placed on him, which he wore for four months, day and night. During this period he suffered much loss of sleep. It was necessary that he take medicine to ease the pain. He was made very nervous and, due to the pain, he was required to roll out of bed on his knees and remain on his knees until the pain would subside and he could get up. He wore this body brace continuously in the daytime with its uncomfortable features for nearly a year after the collision. At the time of the trial, twenty months after the collision, he still suffered pain when lifting or doing any heavy work. He is unable to drive a tractor. He is required to use the brace when exerting himself, and to have hired help, when doing heavy work. His condition was improved at the time of the trial but he still suffered pain when doing any heavy lifting or exercise.

Under the circumstances, defendant's contention that the verdict is excessive, must be overruled. The judgment is affirmed. All concur.