Edith HOMFELD and Cleo Homfeld, Respondents,

v.

Verna LaVonne WILCOXON, Appellant.

No. 45697.

Supreme Court of Missouri, Division No. 1.

July 8, 1957.

Rehearing Denied Sept. 9, 1957.

Wesner & Wesner, Sedalia, for appellant.

Skelton & Bradley, Lexington, for respondents.

VAN OSDOL, Commissioner.

Plaintiffs, Edith Homfeld and her husband Cleo Homfeld, instituted this action in two counts. Count I stated plaintiff-wife's claim for personal injuries alleged to have been the result of a near collision between the 1950 Ford coach driven by plaintiff-wife and the 1952 Ford coach driven by defendant, Verna Lavonne Wilcoxon, at or near the intersection of two graveled public highways in Lafayette County. As intimated, the vehicles did not actually collide, but plaintiff-wife was injured after the near collision when the Homfeld vehicle collided with the concrete abutment of a culvert something like 200 feet from the intersection. Count II stated plaintiff-husband's claim for loss of services and companionship of the wife, and for surgical and medical expenses incurred by the husband by reason of the wife's injuries. The claims as stated in both counts were submitted in plaintiffs' principal verdict-directing Instruction No. 1 on the theory of negligence of defendant under the humanitarian rule in failing to stop her vehicle after she could have seen plaintiff-wife was in a position of imminent peril. A jury returned a verdict awarding plaintiff-wife $7,500 on Count I, and awarding plaintiff-husband $2,500 on Count II. Defendant has appealed from the ensuing judgment.

Herein on appeal the principal question for review is whether, considering the evidence from a standpoint most favorable to plaintiffs, there was a submissible issue of negligence of defendant under the humanitarian rule. Defendant-appellant asserts that plaintiff-wife, Edith, was never in a position of certain, immediate and impending peril of a collision with defendant's vehicle; and that defendant did not have the ability and the means at hand to prevent the vehicle driven by plaintiff-wife from colliding with the concrete abutment.

A little before noon on a hot dry clear July day, plaintiff-wife, Edith Homfeld, was driving westwardly on an undesignated east-west graveled public highway (which we sometimes hereinafter refer to as highway "A") with right of way a little less

than 40 feet wide; highway A connects north-south Highways 131 and M in southwest Lafayette County. Defendant, Verna Lavonne Wilcoxon, accompanied by her mother and sister, was driving her father's automobile northwardly on an undesignated north-south graveled highway (which we sometimes hereinafter refer to as highway "B") lying between north-south Highways 131 and M. The north-south highway B intersects east-west highway A at a point approximately four miles southwest of the junction of Highway M with Highway 40. Approaching from the south, graveled highway B branches to the right and left forming a "Y" affording movement of vehicles respectively to (and from) the west and east over highway A. Highway B does not pass northwardly across highway A. The graveled portion of the west branch of the Y curves northwestwardly from a point approximately 30 feet south of the center of highway A and approximately 40 feet southeast of the point of the near collision.

At the time plaintiff-wife was injured, there were weeds, grass and brush on and along the surface of the three or four foot elevated embankment south of highway A and east of highway B. Also, there are two trees and a telephone pole on the embankment. So the view across the southeast corner of the intersection was obstructed until travelers were in near approach from the east on highway A and from the south on highway B.

The easterly tree on the south embankment of highway A is approximately 130 feet east of the point of the near collision. Ditches 12 or 18 inches deep are graded on both sides of highway A between the intersection and the concrete culvert abutment with which plaintiffs' vehicle collided. As indicated, the concrete abutment is approximately 200 feet west of the point of the near collision. In a westbound approach on highway A to the intersection, the traveler comes over the crest of a hill (485 feet east of the point of the near collision and 685 feet east of the

concrete abutment with which plaintiffs' vehicle collided) and moves down a four per cent grade of the graveled portion of the highway, which graveled portion varies from 15 or 16 to 22 feet in width. The usual travel over highway A is in but one lane in the approximate center of the graveled portion, that is, two vehicular wheel or tire tracks "beat out and hard." There "is a lot of gravel on that and there was two ruts cut along there and at the sides there was a lot of loose gravel." There was loose gravel in the road "in the center and on each side (in about the same amount)" where it had been "whipped out" by the wheels of vehicles.

Plaintiff Edith testified that, moving at a speed of 40 miles per hour westwardly on highway A, she came over the crest of the hill east of the intersection and drove downgrade at that speed until she came about even with the "east tree" (approximately 130 feet east of the point of the near collision, as stated). There she saw defendant's car approaching on highway B. Defendant's car was in the west branch of the Y headed northwest. Plaintiff Edith put her foot on the brake and then, when she realized defendant's car wasn't going to stop or yield the right of way, she pulled to the north and "stayed on the north side and went around her." The brakes of plaintiffs' car had slowed it down, but the car was in loose gravel. Plaintiffs' car was going "around 20" miles per hour when it passed through the intersection. When plaintiff Edith first saw defendant's car it was seven or eight feet south of the south edge of the gravel of highway A. Defendant's car was then moving five miles per hour. It increased speed to ten miles per hour and moved seven or eight feet out into the graveled portion of highway A. (Plaintiff Edith thought the graveled portion of highway A was 15 feet wide at that point.) Other witnesses for plaintiffs testified tire marks indicated the front wheels of the Wilcoxon automobile reached "about the middle of the (east-west) road." "That would be

in between" the two main tracks. It was said the front bumper of a Ford extends about one foot in front of the front wheels. When defendant's automobile pulled out into the east-west road, defendant apparently tried to "straighten up" on the road, then turned left over into the drainage ditch on the south side of highway A. The Homfeld car continued on the north side of highway A with the left wheels in the loose gravel north of the north track and the right wheels at the edge of the drainage ditch, turned left and skidded sidewise into the south concrete abutment. There was other evidence tending to support the fact that the right wheels of the Homfeld car were in the drainage ditch as it passed along the north side of the intersection and then passed "sharply out of the graded ditch and across the road." The witness said the car apparently skidded sidewise three times and into and against the culvert abutment on the south side of highway A.

Plaintiffs introduced portions of defendant's deposition including defendant's statements that defendant followed the "one set of tracks" around the west branch of the Y. She was driving five miles per hour, and could have stopped her vehicle in five to ten feet. She changed gears, although she did not stop, when she was "a little ways past" where the tracks of highway B start to form the Y. When she changed gears, she looked east and west, but she didn't look east after that. When she was at that point she could have seen as far as the crest of the hill approximately 485 feet to the eastward.

Both of the motor vehicles involved were in good operating condition and were equipped with adequate brakes. There was expert testimony that, moving at a speed of 40 miles per hour, plaintiffs' automobile could have been stopped within 162 feet, including the distance the car moved during reaction time of three-fourths of a second; that plaintiffs' automobile moving at 20 miles per hour at the intersection could have been stopped within a distance of 24 to 30 feet; and that defendant's automobile, moving five miles per hour, could have been stopped in seven and nine-tenths feet.

The first step in determining whether a plaintiff has made out a submissible case under the humanitarian doctrine is to ascertain if there was substantial evidence that he was in a situation of imminent peril; and, next, that defendant was negligent after the situation of imminent peril arose. A situation of imminent peril has been described as the basic fact of the humanitarian doctrine. This is for the reason that no duty is imposed on a defendant by that doctrine unless and until a situation of imminent peril has come into existence. Blaser v. Coleman, 358 Mo. 157, 213 S.W.2d 420; Steuernagel v. St. Louis Public Service Co., 357 Mo. 904, 211 S.W.2d 696.

Defendant-appellant, introductory to her argument that plaintiff was never in a position or situation of imminent peril of a collision with defendant's automobile, correctly states that peril to be "imminent peril" under the humanitarian doctrine must be certain, immediate and impending, a mere possibility of injury is not sufficient to create imminent peril. West v. St. Louis-San Francisco Ry. Co., Mo.Sup., 295 S.W.2d 48; Stephens v. Thompson, Mo.Sup., 293 S.W.2d 392; Blaser v. Coleman, supra. Defendant-appellant then initially argues that, under the facts of the instant case, it cannot be said plaintiff Edith was in a position or situation of certain, immediate and impending peril of colliding with defendant's vehicle. Says defendant-appellant, certainly there was no contact between the automobiles involved and it is inconceivable how a collision that never occurred could reasonably be termed "certain." However, we cannot entirely follow defendant's initial argument. The application of the humanitarian rule to a factual situation does not await a "certain collision" or injury. The doctrine seizes upon

the situation when plaintiff is in certain, immediate and impending *"peril"* of injury, that is, certain, immediate and impending peril of injury for the person affected. It is then that a plaintiff is in a situation or position of "imminent peril" in a humanitarian rule sense. But the doctrine or rule contemplates that, thereafter, defendant, with the present ability with the means at hand, has the humanitarian duty to act in averting the impending injury. Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482. Nevertheless, we do not wish to say as a matter of law that the humanitarian rule is inapplicable in all cases where there is in fact no contact or collision, although we have been cited and have found no case wherein the humanitarian rule was applied to a "near collision" or "no contact" situation such as obtains in our case. But see General Exchange Ins. Corp. v. Young, 357 Mo. 1099, 212 S.W.2d 396; Id., Mo.App., 206 S.W.2d 683, a "no contact" situation in which the insurer-assignee's case was submitted on the theory of primary negligence.

■ A person who is not oblivious is in a position of imminent peril when he is directly in the path of a moving vehicle or so close thereto that he cannot stop short of its path. Ukman v. Hoover Motor Exp. Co., Mo.Sup., 269 S.W.2d 35; Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47. In the instant case, however, if it be assumed that a jury reasonably could find that plaintiff Edith could not stop the Homfeld car short of the pathway of the Wilcoxon car as the latter was moving around the curve of the west branch of the Y into highway A, and that a jury reasonably could find that defendant was negligent in failing to stop (or in failing to look out for cars approaching from the eastward on highway A, or in driving her vehicle out into, or partially into, the path of the oncoming Homfeld car), nevertheless, it would seem the situation, as disclosed by the evidence in this case, was not one to which the humanitarian rule was applicable. Plaintiff-

wife was not oblivious. She became aware of the approach of the Wilcoxon car and, by her movement of the Homfeld automobile to the northward, plaintiff-wife was able to and did in fact avoid the danger of injury at the point of the near collision. Consequently, it would seem she was not theretofore in imminent peril of injury. By swerving or turning her car—we repeat —she *avoided* whatever danger inhered in the situation at the intersection. Now, we think we can soundly say defendant's conduct in failing to stop (which we have assumed was negligent) and in thus causing plaintiff-wife to swerve, reasonably could be said to have brought plaintiff-wife into a position of imminent peril of injury. But, thereafter, defendant couldn't do anything about it.

In Blaser v. Coleman, supra, the driver of defendants' dump truck left his post and jumped from the cab, abandoning the truck. Thereafter, plaintiff's imminent peril arose. But after the driver jumped from the cab it was too late for any duty under the humanitarian doctrine to fasten upon defendants because it was then impossible for them to avert the injury. *Defendants had no present ability with the means at hand to do so.* The fact that they put it out of their power to avert the injury in nowise affected the nonapplication of the humanitarian doctrine because the doctrine takes the facts as it finds them when plaintiff's peril arises.

■ In our case, as we have said, it seems clear to us that plaintiff-wife reasonably could be said to have come into a situation of imminent peril of injury at the point of the near collision in her approach to the concrete abutment with which the Homfeld automobile collided. During the period of time and in the movement of the Homfeld car over the segment of highway A between the point of near collision at the intersection and the place of plaintiff-wife's injury at the culvert, defendant had no control over the situation and, with the means at hand,

could have done nothing to avert the impending injury. So we think that whatever negligent act or omission of defendant, in her approach and entry into highway A at the intersection, which caused or had its part in causing plaintiff-wife's injuries in colliding with the abutment of the culvert, was not humanitarian negligence. And, therefore, in determining the question of the ultimate liability of defendant in the shown circumstances of this case, we think that the entire primary conduct of the parties involved antecedent to plaintiff-wife's injury at the culvert may be taken into account; and that the humanitarian rule is not applicable to the facts of this case.

However, in this case, although the judgment is to be reversed, we will remand the cause for a new trial on issues of primary negligence, even though plaintiffs' allegations of primary negligence were abandoned and their case submitted on the theory of humanitarian negligence. We have not seen that plaintiffs introduced evidence supporting allegations of primary negligence and abandoned such charges with the view of securing a strategic advantage, as in Smith v. St. Louis Public Service Co., 364 Mo. 104, 259 S.W.2d 692. The question of the application of humanitarian doctrine to a set of facts, such as shown by the evidence in this case, seems to us to be a new one. In the exercise of discretion, we will give effect in this case to the general rule that in the furtherance of justice a case should not be reversed without remand unless the appellate court is convinced that the facts are such that a recovery cannot be had, that is, if plaintiff has shown facts which might entitle him to recovery if his case were submitted on a proper theory. Smith v. Terminal R. Ass'n of St. Louis, Mo. App., 160 S.W.2d 476; Blaser v. Coleman, supra; Cudney v. Midcontinent Airlines, 363 Mo. 922, 254 S.W.2d 662.

It is ordered that the judgment be reversed and the cause remanded.

COIL, C., concurs in result.

HOLMAN, C., concurs.

HOLLINGSWORTH, HYDE, and DALTON, JJ., concur.

WESTHUES, J., concurs in result and adopts memorandum of COIL, C., as his concurring opinion.

WESTHUES, Justice (concurring in result; adopting opinion of COIL, C.).

I agree that plaintiffs' evidence shows that defendant could not have effectively acted to have prevented injury to plaintiffs *from a collision with the bridge* after plaintiffs were in imminent peril *of such injury*—and, therefore, I agree that the court erred in submitting the case to the jury under the humanitarian doctrine. I also agree that plaintiffs should have an opportunity to a jury decision on defendant's primary negligence. Consequently, I concur in result. *But*—

I do not agree with the statement on page 7, line 8 of the opinion [304 S.W.2d 810], viz., "Consequently, it would seem she was not theretofore in imminent peril of injury" or with the apparent reason for that statement which immediately follows, viz., "By swerving or turning her car—we repeat—she *avoided* whatever danger inhered in the situation at the intersection." That is because: there was substantial evidence from which a jury reasonably could have found that plaintiffs were in a position of imminent peril of injury from a collision of the two automobiles at the intersection. True, plaintiff by evasive action (swerving) extricated herself from that position of imminent peril. The fact that she "*avoided* whatever danger inhered in the situation at the intersection," (which I assume means essentially that she avoided a collision with

defendant's automobile) did not eliminate or change the fact that plaintiffs theretofore *were* in a position of imminent peril. According to the opinion, a position of imminent peril cannot exist unless injury actually occurs—I do not agree.

As I see the instant case, the situation is simply this: Plaintiff was not in a position of imminent peril of injury from a collision of her automobile with the bridge until after she had to swerve in order to extricate herself from her prior and separate position of imminent peril which a jury reasonably could have found existed at the intersection. It is apparent that defendant could not have prevented plaintiff's injury after plaintiff was in the second or subsequent position of imminent peril, i. e., after the time when it became necessary for plaintiff to swerve to avoid an intersection collision with defendants' automobile.