**UKMAN**

v.

**HOOVER MOTOR EXPRESS CO.,**
Inc., et al.

No. 43862.

Supreme Court of Missouri.

Division No. 1.

June 14, 1954.

Lashly, Lashly & Miller and John H. Lashly, St. Louis, for appellants.

Mortimer A. Rosecan, Charles E. Gray, St. Louis, for respondent.

COIL, Commissioner.

Defendants-appellants have appealed from a judgment for $15,000 entered on plaintiff-respondent's verdict in his claim for damages for personal injuries allegedly sustained when plaintiff's station wagon,

traveling east on Pine Street in St. Louis, was struck by defendant Hoover's tractor-trailer being driven north on 21st Street by Hoover's employee, defendant Rock. Defendants contend that plaintiff failed to make a submissible case, that the court erred in giving an instruction, and that the judgment is excessive.

Plaintiff, who chose to submit his case to the jury solely on defendants' alleged humanitarian negligence in failing to stop, contends that defendants have failed to preserve for appellate review the issue of submissibility. At the close of plaintiff's evidence, defendants' motion to dismiss was overruled. Defendants adduced evidence and, at the close of all the evidence, did not file a motion for directed verdict. In an after-trial motion the trial court was asked to set aside plaintiff's verdict and judgment and to enter judgment for defendants in accordance with defendants' motion for directed verdict *filed at the close of plaintiff's case,* on the ground that plaintiff *had* failed to make a submissible case. Defendants' motion for new trial contained no reason which related to or suggested the failure of plaintiff to make a case for the jury.

▮ Thus defendants not only failed to move for a directed verdict at the close of all the evidence but also failed in any after-trial motion to complain of the action of the trial court in submitting the case to the jury at the close of *all* the evidence. Section 512.160, subd. 1, RSMo 1949, V.A.M.S. provides that except for the questions of jurisdiction over the subject matter and as to failure of a pleading to state a claim upon which relief can be granted "no allegations of error shall be considered in any civil appeal except such as have been presented to or expressly decided by the trial court." Section 510.290 provides in effect that if a motion for directed verdict is made *at the close of all the evidence* and is not granted, the party who has so moved may within ten days move to have the verdict and judgment set aside in accordance with his motion for directed verdict. Section 510.310, subd. 4 provides that on appeal in

cases tried *without a jury* "The question of the sufficiency of the evidence to support the judgment may be raised whether or not the question was raised in the trial court." (A provision not incorporated in § 510.290, supra.) It appears from the foregoing statutory provisions that it is necessary in jury-tried cases, in order to preserve the question of submissibility for appellate review, to file a motion for directed verdict at the close of all the evidence and to assign the error of the court in having failed to have directed such a verdict in an after-trial motion, either one for a new trial or one to set aside a verdict and judgment and enter judgment for the opposite party.

We have found no case which has ruled a situation precisely like the instant one. The decided cases involving somewhat analogous problems, deal with situations in which the trial court has been given some opportunity to rule the question of whether plaintiff made a submissible case at the close of all the evidence, either on a motion for directed verdict filed at the close of all the evidence, or on an after-trial motion specifically raising the issue. See: Clay v. Owen, 338 Mo. 1061, 1064[2], 93 S.W.2d 914, 915 [3–5]; Rogers v. Poteet, 355 Mo. 986, 998, 199 S.W.2d 378, 386; Oganaso v. Mellow, 356 Mo. 228, 231[2], 201 S.W.2d 365, 366 [2–4]; Johnson v. Kansas City Public Service Co., 358 Mo. 253, 257, 214 S.W.2d 5, 8[3–5]; Hauber v. Gentry, Mo.Sup., 215 S.W.2d 754, 759[12]; Bailey v. Interstate Airmotive, 358 Mo. 1121, 1128, 219 S.W.2d 333, 335[2], 336[3], 8 A.L.R.2d 710; Hughes v. St. Louis Nat. League Baseball Club, 359 Mo. 993, 997[2], 224 S.W.2d 989, 992[4, 5], 16 A.L.R.2d 904; Nelson v. Kansas City, 360 Mo. 143, 147, 148, 227 S.W.2d 672, 673, 674[3]; Wood v. St. Louis Public Service Co., Mo.Sup., 228 S.W.2d 665, 666 [1]; Wilhelm v. Haemmerle, Mo.Sup., 262 S.W.2d 609, 611[2]; Silberman v. Hicks, Mo.App., 231 S.W.2d 283, 285[3].

In the instant case, however, defendants' assignment of error in their motion for new trial, as carried forward in their brief on appeal, pertaining to instruction 1, is that there was no evidence to support that

part of plaintiff's humanitarian instruction which hypothesized that plaintiff was in a position of imminent peril at a time when defendant Rock thereafter could have stopped his truck and avoided the accident. Thus, the question of submissibility as to that issue must be decided in determining defendants' claim of error as to instruction 1. In view of our conclusion that the instruction was not erroneous—in other words, that there was sufficient evidence to justify that portion of plaintiff's instruction 1 mentioned above—we need not decide whether defendants' failure to properly preserve the question of submissibility for appellate review would prevent our examination thereof, or would require in this case, or if not, in what cases, the application of Supreme Court Rule 3.27, 42 V.A.M.S. The provisions of the Code relating to the manner in which the submissibility question may be preserved for appellate review seem clear and explicit. Questions on appeal pertaining to alleged failure to properly preserve the issue of submissibility for appellate review are obviated by compliance with those provisions.

■ In determining whether there was evidence to support the hypotheses that, after plaintiff came into a position of imminent peril, defendant Rock could have stopped and thereby could have avoided the collision, we review the evidence from a standpoint favorable to plaintiff and give him the benefit of any part of defendants' evidence favorable to him, not contradicted by plaintiff's own testimony and not contrary to plaintiff's fundamental theory, and we give plaintiff the benefit of all reasonable inferences from all the evidence, and disregard all of defendants' unfavorable evidence. Smithers v. Barker, 341 Mo. 1017, 1023[1], 111 S.W.2d 47, 50[1, 2].

Such a review of the evidence discloses that a jury reasonably could find these facts: that the front bumper of defendants' tractor-trailer, weighing, as loaded, 40,000 pounds, struck plaintiff's station wagon at the door thereof when the station wagon was proceeding eastwardly two feet south of the center of Pine Street and when the station wagon's front was one foot east of the east curb line of 21st Street; that when the front of the station wagon reached a place about 50 feet west of where it was at collision time, the station wagon's speed had been decreased from 20 to 25 m.p.h. to 15 m.p.h. and that its speed was there accelerated to 17 or 18 m.p.h., and that from such point (about 50 feet to the west) plaintiff traveled to where it was at collision time at an average speed of 17 m.p.h.; that it took plaintiff two seconds to travel the distance from such point to the place where the station wagon was at the time of the collision; that Rock, at the time plaintiff was at the place mentioned (about 50 feet to the west), was driving the tractor-trailer north on 21st Street at a speed of 5 m.p.h., so that at the time plaintiff was at the place about 50 feet to the west, the tractor-trailer had to be 14.5 feet south of the collision point; that Rock by actual experiment (not by estimate) could stop the tractor-trailer he was then driving, loaded as it was and under the street and weather conditions existing at the time of the accident, traveling at 5 m.p.h. in a total distance of 10 feet, including reaction time; that plaintiff did not see defendants' truck approaching Pine Street and was not aware of its proximity until an instant prior to impact; that Rock, in the exercise of the highest degree of care, could have seen plaintiff's station wagon when it was at a place before it reached the place about 50 feet west of the collision point; that it required at least 31 feet, including reaction time, for plaintiff to stop his station wagon under the conditions existing at the time of the collision; that if Rock, in the exercise of the highest degree of care, had seen plaintiff's station wagon as it approached and when it reached the place about 50 feet west of the collision point, he would have observed that plaintiff slowed to a speed of 15 m.p.h., looked to his right and left, immediately accelerated to 17 or 18 m.p.h., and continued eastwardly in the same position and in a straight line toward the intersection; that when the front of the station wagon reached a point 31 feet to the west of the path

of the other vehicle and at least 38 feet west of the place where the front of the station wagon was at the time of the collision, plaintiff had proceeded to the point in his approach after which he could not stop his station wagon short of the path of defendants' vehicle.

■ "Under the humanitarian doctrine no duty to act was imposed on defendant until a situation of imminent peril came into existence." Yeaman v. Storms, 358 Mo. 774, 778[2], 217 S.W.2d 495, 498[1].

■ When, under the particular facts of this case, did Rock have a duty to act? We agree with defendants that the evidence did not warrant a finding that Rock knew, or in the exercise of the highest degree of care should have known, that plaintiff was oblivious of the approach of defendants' tractor-trailer so that, by reason of plaintiff's obliviousness, his zone of imminent peril was extended back to the west beyond the place where the station wagon arrived at the point where it could not be stopped thereafter short of the tractor-trailer's path. That plaintiff was in fact oblivious of the approach of the other vehicle did not impose a duty on defendant to act. There must have been some evidence from which the jury reasonably could find that Rock, in the exercise of the highest degree of care, should have been aware of plaintiff's obliviousness. "It is the reasonable appearances of the situation that imposes the duty to act." Turbett v. Thompson, Mo.Sup., 252 S.W.2d 319, 321. What, then, could a jury find were the reasonable appearances to Rock if he had seen everything he could or should have seen as plaintiff approached the intersection? As we have noted, Rock would have seen plaintiff's station wagon approach from the west for some undetermined distance (the exact distance is unimportant) at 20 to 25 m.p.h.; he would have seen the station wagon slow to 15 m.p.h. when it reached a place about 50 feet from the point the front of his station wagon reached at the time of the collision, and when the front of the station wagon was about 10 feet west of the west curb line of 21st Street; he would have seen

plaintiff look to his left and right, north and south, on 21st Street; he would have seen the station wagon continue toward the intersection at a slightly increased speed.

Certainly there was no substantial evidence from which the jury reasonably could find that there were any appearances from which Rock should have realized plaintiff's obliviousness when the station wagon was 50 feet from the point its front reached at collision time and when 43 feet from the path of the tractor-trailer. (The station wagon traveled 7 feet into the tractor-trailer's path before the collision.) Defendants' expert testified that at 15 m.p.h. plaintiff could stop the station wagon in 31 feet including reaction time. Plaintiff, then, traveled 12 feet from the place 43 feet from the path of the tractor-trailer to the place 31 feet therefrom. He went this distance in about one half of a second. Under the circumstances the evidence was not such as to warrant a jury finding that it should have appeared to Rock that plaintiff was oblivious of the danger of collision and intent on proceeding through the intersection until plaintiff had reached the point 31 feet from the path of the tractor-trailer (38 feet from the point where the front of the station wagon was at the time of the collision); or, in other words, before plaintiff reached a point after passing which he could not thereafter stop short of the path of the other vehicle. So that under the evidence in this case, plaintiff did not come into a position of imminent peril, in so far as defendants' duty to act was involved, any sooner than he would, had he been nonoblivious in fact. Lotta v. Kansas City Public Service Co., 342 Mo. 743, 750[1], 117 S.W.2d 296, 300[1–3].

But when plaintiff was at that point (where he could not stop short of the path of the other vehicle), and in imminent peril, the tractor-trailer was, for all practicable purposes, 11 feet from the collision point, or a distance south of one foot more than the distance required to stop the tractor-trailer including Rock's reaction time.

There was no testimony as to the distance it would have required plaintiff to have

stopped his station wagon at any speed other than 15 m.p.h. But plaintiff testified that he accelerated from 15 m.p.h. when 43 feet from the tractor-trailer's path so that at the instant before the collision he was going 17 or 18 m.p.h. Thus the jury could reasonably infer that it would have taken plaintiff more than 31 feet to stop and thereby plaintiff would have come into a position of imminent peril before he reached the place 31 feet from the tractor-trailer's path. By the same token, Rock then would have been farther than 11 feet from the collision point. The effect of this is simply to point out that the jury reasonably could have found that Rock had some distance more than 11 feet in which to stop but that the jury had no basis for determining how much more.

■ All of which results in the conclusion that, under the evidence considered most favorably from plaintiff's standpoint, it may be demonstrated mathematically, without resort to speculation and conjecture, that Rock had at least 11 feet in which to stop when he needed only 10 (not by estimate but by actual experience). That conclusion, in turn, precludes us from declaring as a matter of law that the questioned portion of plaintiff's instruction was not justified by the evidence.

We have, of course, examined the cases cited by defendants. Those cases enunciate the principles of law which we have applied herein. The contrary results reached in some of those cases are by reason of the application of the same established legal principles to different sets of facts.

■ In determining the excessiveness of the verdict and judgment, we review the pertinent evidence from the standpoint most favorable to plaintiff. Plaintiff, 29 years old at trial time—27 at the time of the accident—was a partner in a company which assembled lamps. His work consisted of selling, designing, subcontracting for parts, and, on occasion, supervising the assembly and packing of the merchandise. As a result of the collision, he sustained a rupture of the intervertebral disc between the

fifth lumbar and the first sacral vertebrae on the right. Immediately following the accident he suffered headaches and back pains but continued without medical attention until some 3 weeks later when the back pains became so intense that he consulted a physician who taped his back and advised him to return to his home. Thereafter he remained in bed for 6 or 7 days under the doctor's care. On the seventh or eighth day a further examination resulted in the doctor advising, and his being fitted with, a surgical belt which was a "corset" type with 7 or 8 steel stays in it. The belt gave him relief from the severity of pain as long as he was able to wear it. In April 1951, he was hospitalized for X-rays and a myelogram for the purpose of confirming the tentative diagnosis of a herniated disc. Immediately following this procedure and continuing intermittently to trial time, he had suffered headaches. Since April 1951 the amount of pain suffered had been less, but the areas and degree of numbness in his leg had increased. At trial time, these areas included the calf of his leg, complete numbness in his right heel, numbness and a "cold feeling" in the bottom of his right foot.

He testified that the condition of his right leg was getting progressively worse, that it tires him to walk, and that he drags his right leg; that, at trial time, he suffered pain in his back which he described as intermittent dull "toothache" pains and the feeling of numbness continued. He was advised by two doctors to have an operation for the removal of the herniated disc. In answer to a question as to why he had not submitted to the operation, he stated, "Well, personally, myself, I feel that, after consulting with doctors, in view of the odds it can be successful, I can get better or worse, or remain the same, I felt I would endure the pain I have now and go on until it takes a definite change, until it warrants it. I, personally, am afraid to go into it. I may be worse off after it than when I started. Nobody can guarantee you that." There was no evidence of hospital or medical expense or loss of earnings.

Dr. Joseph Gitt, a neurologist, testified that he was called in (apparently in April 1951) to diagnose plaintiff's condition. He examined the X-rays and the myelogram and made a clinical examination. The important positive objective findings were a unilateral spasticity of the muscular spinal group on the right; an absence of the right ankle jerk; tenderness to percussion of the fifth lumbar; areas of lack of sensation. These findings indicated a definite involvement of the sciatic nerve. Dr. Gitt diagnosed plaintiff's condition as a ruptured intervertebral disc which he said was a condition productive of pain. He examined plaintiff again on the morning of the trial and his findings were essentially the same as in April 1951. He noted a weakness in the right foot which was causing plaintiff's right leg to drag. The doctor had recommended an operation for removal of the disc and said that it was a major operation requiring hospitalization for about two weeks and no one could guarantee a particular individual a good result; but that based upon statistics, 70% or 80% who undergo the operation will be cured or helped; 17% or 20% will remain in the same condition or will be made worse by the operation, i. e., their pain may be greater and they may have a greater degree of muscular deficiency; and that a disc may recur in the same area after the operation, and that the medical profession is at a loss as to how to give relief where the disc recurs other than by physiotherapy, medicines, surgical supports, and like treatment.

Dr. Leon Fox, an orthopedic surgeon, saw plaintiff the first time on January 13, 1951. Plaintiff complained of severe pain radiating from his back to his right thigh and the calf of his right leg. On examination Dr. Fox found that plaintiff was hardly able to stand because of pain, walked with a definite limp, was tilted, was having severe muscular spasm in the back, all motion in the back was practically absent, there was no reflex of the right ankle, there were changes in sensation along the outer side of the right thigh and right calf and severe pain on pressure of the lower lumbar area. He diagnosed plaintiff's condition as severe sciatica as a result of a ruptured intervertebral disc, probably the fifth lumbar space on the right.

Thereafter, plaintiff's condition did not improve and the area of numbness increased. A myelogram showed a large herniation of the disc in the right fifth interspace between the fifth lumbar and first sacral vertebrae. He said this condition was productive of pain because of pressure on the nerve root and nerves which go into the back, and that loss of sensation was caused by the pinching of nerves. At trial time, plaintiff had atrophic changes in his right leg—the muscles in the calf had lost their pull and strength. Plaintiff could not walk on the toes of his right foot and the muscles on his right side were thicker and flabbier than those on the left. Plaintiff limps when he walks because of muscular weakness. Without an operation, plaintiff probably will get worse. There is an excellent possibility that he will continue to limp the rest of his life; he will continue to have loss of feeling in his back, his right buttock, and his right heel the rest of his life, and will continue to have limitation of motion in his back as long as the pain continues; the muscular weakness probably will persist even though plaintiff has an operation to remove the disc because of permanent nerve fiber damage. Plaintiff "is going to be definitely limited in those activities in which he needs full muscular strength in his right leg, or any activity in which he needs the full strength of his back to bend or lift."

Dr. Fox had also recommended an operation and said that while the operation might result in the death of a patient, success was obtained in 80% to 85% of patients, including excellent, good, and fairly good results. Fifty-five per cent to 60% showed a good result. In 15% the condition remained the same or became worse. When the operation resulted in a worse condition than before, "The pain may become so bad if they become worse that,

even after repeated surgery, in an attempt to correct it, they may have to have a sensory division of the nerves, and in cases there is a neural lobotomy. * * * A cutting of the nerve pathways in the brain, so they won't feel the pain." Sometimes scar tissue forms in the interspace after removal of the disc which sometimes is painful.

Defendants adduced no medical testimony although it was agreed that plaintiff had been examined by a doctor of defendants' choice.

Defendants stress that there was no evidence either that plaintiff has been unable to continue the same duties in his business as he performed before he was injured, or that he sustained any financial loss by reason of hospital or medical expenses. Defendants do not dispute the fact that plaintiff did sustain a ruptured intervertebral disc or that, without an operation, plaintiff will continue to suffer pain and the other permanent effects described by the doctors. Apparently, defendants' main reliance is in their contention that plaintiff should have followed his doctors' advice and submitted to an operation. The jury was instructed (of which no complaint is here made) that plaintiff's damages should not be diminished by his refusal to undergo an operation if it found it would be a serious operation involving a reasonable doubt as to outcome or a reasonable risk of aggravating or worsening plaintiff's condition. See: Kay v. Kansas City Public Service Co., Mo.App., 23 S.W.2d 1087, 1088[2–4]; King v. City of St. Louis, Mo. App., 155 S.W.2d 557, 565[14, 15].

 We think it is apparent from what we have said in our review of the nature and effects of plaintiff's injury that we should not be justified in interfering with the jury's award of $15,000, approved by the trial court on motion for new trial. We are fortified in this conclusion by the decisions of this court in De Moulin v. Roetheli, 354 Mo. 425, 437[10], 189 S.W.2d 562, 567[13–16]; Lange v. St. Louis Public Service Co., Mo.Sup., 233 S.W.2d 641, 642 [3] [4]; McCaffery v. St. Louis Public Service Co., Mo.Sup., 252 S.W.2d 361, 369–371.

The judgment is affirmed.

VAN OSDOL and LOZIER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.