**Charles R. CHILTON, et ux.,**
**Plaintiffs–Appellants,**

v.

**Glada Irene GORDEN, Defendant–**
**Respondent.**

**No. 21117.**

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 24, 1997.

Michael D. Holzknecht, Kansas City, for Appellant.

Jerry M. (Jay) Kirksey, Douglas, Lynch, Haun & Kirksey, P.C., Bolivar, for Respondent.

PARRISH, Judge.

Charles R. Chilton and Linda Kay Chilton, husband and wife, (collectively referred to as plaintiffs) brought a negligence action against Glada Gorden (defendant) for damages they contend resulted from an automobile accident involving vehicles driven by Mr. Chilton and defendant. Mr. Chilton sought damages for personal injuries he alleged were sustained in the accident. Mrs. Chilton sought damages for loss of consortium. At trial defendant admitted fault in causing the

accident but contested plaintiffs' allegation of damages. A jury found for defendant. Judgment was entered in accordance with the verdict. This court affirms.

The accident occurred June 7, 1991.[1] Defendant testified:

> He pulled up to the stop sign and stopped. And I stopped behind him. . . .
>
> But I was just watching that car to my left and let my foot off the brake. My car moved forward, and it stopped. And I had never seen Mr. Chilton's big blue station wagon sitting there. I just thought that he had just pulled on around—because I guess I had my head turned enough that I just couldn't see the station wagon.

Defendant added, "And anyway, my car stopped. And I thought, what happened? And there I had hit him."

Defendant was asked, "Now, Mrs. Gorden, the accident is your fault?" She answered, "Sure. I mean—I mean, you know—I hit him from the rear end."

Mr. Chilton reported the accident to his office. Personnel there reported the accident to the park board's regional office. Mr. Chilton's supervisor directed him to go to a hospital.

After going to a Wal–Mart store, Mr. Chilton went to the hospital at Bolivar, Missouri. The doctor he saw in the hospital emergency room, Dr. Harris, was the doctor he usually consulted for medical treatment. Mr. Chilton was released from the emergency room and told to follow up with Dr. Harris as needed.

Mr. Chilton sought no further medical treatment for injuries he asserted he sustained in the accident until February 9, 1993, when he consulted Dr. Ron Smith, an orthopaedic surgeon practicing in Bolivar, Missouri. Dr. Smith described his professional affiliation as "an independent contractor under the hire of Citizens Memorial Hospital."

Mr. Chilton told Dr. Smith he had experienced numbness and tingling that radiated down his arm and over the back of his hand. He said the symptoms had persisted for a period of several months. Dr. Smith understood Mr. Chilton to mean he had experienced the symptoms "[f]rom two to six months would be an estimate, two to six—or two to seven months."

Dr. Smith was asked the following questions and gave the following answers concerning Mr. Chilton's numbness and tingling complaints:

Q. Now, Doctor, if you had been told those symptoms of numbness and tingling and the pain had been ever since August of 1991, would that be in your notes?

A. Yes.

Q. If you had been told that these symptoms were ever since an auto accident of June 7, 1991, would that be in your notes?

A. Yes.

Q. If you had been told that the symptoms that were described to you began a year before he had seen you, around February of '92 or whatever, would that be in your notes?

A. Yes.

Q. Okay. Is that in your notes somewhere?

A. No.

Dr. Smith was asked what Mr. Chilton told him concerning trauma. He answered, "I indicated that he had no specific trauma to the head, neck or shoulder region."

On April 6, 1993, Mr. Chilton consulted Dr. Thomas Habiger, a neurologist practicing in Springfield, Missouri. Mr. Chilton had been referred to Dr. Habiger by Dr. Smith.

Dr. Habiger testified at trial by videotaped deposition. He explained the reason for the referral:

> The gentleman was having problems with his arm and shoulder and neck, basically pain and some sensory complaints, and Dr. Smith was concerned that he may have a radiculopathy; which is a term we use when a nerve is being compressed or

---

**1.** At the time of the accident, Mr. Chilton was employed by the State of Missouri. He was park superintendent at Pomme de Terre State Park. He was driving a state-owned vehicle en route to get supplies for work.

irritated and it causes a certain specific set of complaints. And Dr. Ron Smith doesn't do spine work, so when he develops—when he has patients that don't seem to respond to conservative management he refers them on to neurology, like myself, to evaluate the patient.

Dr. Habiger was asked what Mr. Chilton told him concerning his discomfort. He answered:

Well, he talked about the fact that he was having problems with his right arm and shoulder and neck, and that he had been involved in a motor vehicle accident. I think we listed it here as a year ago from the time of the accident. He was rear-ended and suffered some complaints that took him to the emergency room at Citizens Memorial. He seemed to have some improvement, but then four or five months prior to an evaluation he began noticing increasing or noticing paresthesia into his right hand and arm; and then a few months ago he noted a more significant amount of pain and the problems with feelings of weakness in the arm.

Mr. Chilton told Dr. Habiger he had no previous history of injury or neck or arm problems, but that he did have a history of low back problems with surgery in 1980. Dr. Habiger concluded, "At the time of his examination, his history and exam most likely fit a C7 radiculopathy." He recommended physical therapy and prescribed anti-inflammatory medication.

Dr. Habiger explained, "There was an initial EMG that we did.... The EMG was something that was not grossly positive. In other words, it didn't show a lot of nerve damage at that time which is another thing that sort of led me away from doing a more invasive diagnostic procedure and into doing a more conservative management program." Mr. Chilton was told to contact Dr. Habiger again if he got worse or had no response to the treatment that was prescribed.

Mr. Chilton returned to Dr. Habiger's office May 3, 1993. He reported that he continued to experience pain and his arm remained weak. Dr. Habiger undertook additional diagnostic procedures. He had Mr. Chilton undergo a cervical myelogram and follow-up CT Scan. Dr. Habiger diagnosed Mr. Chilton's ailment as a herniated disc. He referred Mr. Chilton to a neurosurgeon, Dr. Crabtree.

Dr. Crabtree first saw Mr. Chilton May 18, 1993. He reviewed the test results Dr. Habiger had obtained and agreed with the diagnosis of disc herniation. On May 20, 1993, Dr. Crabtree surgically repaired the herniated disc.

Plaintiffs' first allegation of trial court error is directed to defendant's use of transcripts of statements of two of plaintiffs' witnesses, Clay Meyer and Perry Legg, to impeach their testimony. Plaintiffs contend they requested production of the transcripts defendant used; that the trial court erred in not ordering defendant to produce complete transcripts of those statements for plaintiffs.

During cross-examination of both Mr. Meyer and Mr. Legg, defendant's attorney referred to a prior conversation he had with each of them. He showed each of them what was represented as being a transcript of his conversation with the witness. Each witness acknowledged in considerable detail that the statements they previously made, unlike their testimony at trial, were to the effect that Mr. Chilton did not demonstrate symptoms of discomfort in 1991 after the June 7 accident; that Mr. Chilton indicated to them that he was experiencing numbness and pain in his arm sometime in 1992. The witnesses acknowledged that the statements revealed by the transcripts the attorney showed them were different from the answers they gave on direct examination at trial.

Mr. Meyer, a highway patrolman who was a personal friend with whom Mr. Chilton frequently fished, acknowledged having been asked if he talked to Mr. Chilton shortly after the accident; that Mr. Meyer told defendant's attorney, "Well, he mentioned it to me, yes, he was involved in a wreck."

Mr. Meyer was asked, "So when I asked you later on: And if I'm hearing you correctly, the substance of Mr. Chilton's reply to your inquiry was he was okay." Mr. Meyer answered, "Yes."

Plaintiffs contend that they requested defendant's attorney to produce complete transcripts of the statements he obtained from Mr. Meyer and Mr. Legg, and that they requested the trial court to order production after defendant's attorney refused to voluntarily produce the transcripts. The record does not reveal either request.

Defendant's attorney does not agree with plaintiffs' version of what occurred. He claims plaintiffs never asked for a transcript of Mr. Legg's statement; that the only request was for Mr. Meyer's statement. Defendant's attorney contends a request for the transcript of Mr. Meyer's statement was made, off the record, during a lunch break after Mr. Meyer's testimony and the testimony of another witness had been completed.

Plaintiffs' claims and defendant's dispute of them are presented in their briefs. They are not supported by events included in the record on appeal. "The record on appeal must contain all of the record, proceedings, and evidence necessary to the determination of all questions to be presented to the appellate court for decision." *In re Marriage of Osborne*, 895 S.W.2d 285, 288 (Mo.App.1995). Except where conceded as true by the opposing party, statements asserted in a party's brief that are not supported by the record on appeal supply no basis for appellate review. *Nenninger v. Dept. of Social Services*, 898 S.W.2d 112, 117 (Mo.App.1995); *In re Marriage of Osborne, supra,* at 289.

Plaintiffs attempted to circumvent the lack of record supporting their claim by having caused a verbatim record to be made of the argument of the motion for new trial and verbal dialogue between counsel and the trial court during the course of that argument. They point to various remarks during the argument of the motion in an effort to support the issue raised in their first point.

The value of a verbatim record of an argument of legal questions in the trial court is questionable. Regardless, post-trial recollections of what transpired at trial present nothing for appellate review. *Sams v. Green*, 591 S.W.2d 15, 18 (Mo.App.1979). The obligation to make a record during trial concerning issues a party may wish to pres-

ent on appeal is on that party. *Id.* No record was made. There is nothing to review. Point I is denied.

Plaintiffs' second allegation of error asserts the trial court erred in entering judgment for defendant because defendant admitted fault. They assert "as a matter of law" Mr. Chilton was entitled to recover for medical expenses he incurred.

To prove negligence a plaintiff must establish that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach of that duty was the proximate cause of the plaintiff's injuries. *Martin v. City of Washington*, 848 S.W.2d 487, 493 (Mo. banc 1993). "Liability is the conclusion when there is a duty, breach, and causal connection between the conduct of the defendant and the resulting injury to the plaintiff." *Copeland v. Compton*, 914 S.W.2d 378, 381 (Mo.App.1996). "[T]he test is whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission of the defendant." *Schaffer v. Bess*, 822 S.W.2d 871, 876 (Mo.App.1991).

Although Point II does not use the term "judicial admission," that is the vehicle upon which plaintiffs rely in support of their claim of error.

A judicial admission has been defined as a more or less formal act done during a judicial proceeding which waives or dispenses with the production of evidence and concedes for litigation purposes that a certain proposition is true. *Hewitt v. Masters*, 406 S.W.2d 60, 64 (Mo.Div. 2 1966). Or, as Wigmore says, a judicial admission "is, in truth, a substitute for evidence, in that it does away with the need for evidence." 9 Wigmore, Evidence § 2588 (Chadbourn rev.1981).

*Wild v. Consolidated Aluminum Corp.*, 752 S.W.2d 335, 338 (Mo.App.1988).

Defendant, in her testimony, acknowledged that she was at fault in causing her vehicle to strike the rear of the vehicle Mr. Chilton was driving. Plaintiffs rely on that admission to establish negligence, i.e., that defendant breached a duty she owed Mr. Chilton in the course of operating her automobile. Plain-

tiffs then rely on statements made during the course of trial by defendant's trial counsel to establish a causal connection between defendant's conduct and Mr. Chilton's injury, whether the injury for which he sought compensation was "the reasonable and probable consequence of the act or omission of the defendant."

Plaintiffs point to statements made on behalf of defendant during opening statement and closing argument.[2] During opening statement defendant's attorney said:

*He goes to the doctor—I think he goes to Wal–Mart first, maybe. But he ends up at CMH. He goes to CMH. And at CMH he sees Dr. Harris at the ER. Now, when he sees Dr. Harris he gets treatment. And the diagnosis is made of cervical strain.* Now, we've all probably had cervical strain at one time or the other. Too much exertion. And that goes away after a while....

And during closing argument:

And the bottom line is—and you're tired of hearing it, it's the last time I'll say it—the burden of proof, the burden of causing you to believe that this—this 6–7–91 accident is theirs. *If you don't believe it—If you believe there is a cervical strain which resolved and then fishing or sneezing or whatever caused the herniated disk, the verdict for Defendant.*

Plaintiffs contend that defendant admitted by her testimony that she committed a negligent act, allowing her automobile to strike the rear of the automobile Mr. Chilton was driving, and that the injuries claimed by Mr.

Chilton were acknowledged by defendant during the course of the trial to have been the reasonable and probable consequence of the negligent act. Point II asserts, therefore, "as a matter of law" the judgment for defendant was erroneous.[3]

■ A statement made during counsel's opening or closing statements may constitute a judicial admission if it is unequivocal. *Fust v. Francois*, 913 S.W.2d 38, 46 (Mo.App. 1995). A judicial admission must be clear and unqualified. *Allen v. Watson*, 935 S.W.2d 322, 327 (Mo.App.1996).

■ The statements of defendant's trial attorney were, at most, an acknowledgment that Mr. Chilton went to a doctor at a hospital emergency room after the accident and was diagnosed with a cervical sprain. The opening statement suggested that if there was a cervical sprain, it was not serious. There was no admission that if a cervical sprain existed it was caused by Mr. Chilton's car being struck by defendant's. The attorney's statement suggested that a cervical sprain could arise from "[t]oo much exertion."

The statement in closing argument alluded to the herniated disc for which Mr. Chilton had surgery. Defendant's attorney suggested that a cervical sprain would have had nothing to do with a herniated disc. There had been testimony that fishing or sneezing could cause a herniated disc. The attorney, alluding to that evidence, suggested that if Mr. Chilton had a herniated disc, that ail-

---

**2.** Although plaintiffs refer only to the statements set forth in italics, other remarks are included to permit review of those statements in the context in which they were made.

**3.** The record on appeal does not reveal plaintiffs moved for a directed verdict on the question of liability prior to judgment. Plaintiffs did assert in their motion for new trial "[t]hat there was a complete absence of probative facts to support a verdict for the Defendant in light of the admissions by defense counsel that Defendant was at fault in the collision and that Plaintiff Dick Chilton had indeed suffered a cervical strain...."

Arguably, Point II asserts that evidence adduced at trial would not support a judgment for defendant (considering judicial admissions as ac-

ceptable substitutes for evidence). Numerous cases in which defendants have contested sufficiency of evidence in cases in which plaintiffs have received judgments hold, "The insufficiency of the evidence to support a verdict may be preserved for review by an appellate court only if the appellant files a motion for a directed verdict at the close of all the evidence and alleges the denial of that motion in a motion for a new trial." *Fallert Tool & Engineering Co. v. McClain*, 579 S.W.2d 751, 755 (Mo.App.1979). *See also Millar v. Berg*, 316 S.W.2d 499, 502 (Mo.1958); *Ukman v. Hoover Motor Express Co.*, 269 S.W.2d 35, 36 (Mo.1954); *Herrman Lumber Co. v. Cox*, 521 S.W.2d 4, 6 (Mo.App.1975). This opinion does not address whether this requirement extends to cases in which defendants receive judgments.

ment was not necessarily caused by the accident.

Defendant's attorney's statements were not judicial admissions. As in *Lauber v. Buck*, 615 S.W.2d 89 (Mo.App.1981), the fact that defendant admitted fault for the accident, i.e., that she admitted she had been negligent, was not an admission that Mr. Chilton sustained any injury as a reasonable and probable consequence of her negligent act. Point II is denied.

Plaintiffs' third allegation of error is directed to what is alleged to be juror misconduct. Point III asserts, "The trial court erred in failing to rule on plaintiffs' motion for new trial, or in failing to grant a new trial on the grounds of misconduct of jurors...."

The judgment in this case was filed April 10, 1996. Plaintiffs filed a motion for new trial April 19, 1996. A docket entry reflects the motion was heard by the trial court July 1, 1996, and "taken under advisement." The legal file includes no further docket entries. The trial court's file stamp on the notice of appeal is dated July 22, 1996.

■■■ The record on appeal is silent with respect to a ruling on the motion for new trial. This court, therefore, infers that the trial court did not rule on the motion. Accordingly, the motion was "overruled for all purposes" 90 days after it was filed. Rule 78.06. The fact the motion was denied in that manner is not error. The suggestion in Point III that it was is incorrect.

Plaintiffs' allegation of juror misconduct is directed to Juror Baumgarden.[4] During voir dire plaintiffs' attorney asked the prospective jurors, "Is there anybody here on the panel who knows either [defendant] or her husband, Eddie?" Mrs. Baumgarden did not respond.

The trial court held an evidentiary hearing on the allegation in plaintiffs' motion for new trial of juror misconduct. Plaintiff Kay Chilton and defendant testified concerning the circumstances to which Point III is directed.

Mrs. Chilton was asked the following questions concerning her observations of defendant and gave the following answers:

Q. Now, after the jury had returned with its verdict on March 27th of 1996, were you seated at counsel table?

A. Yes, I was.

Q. Do you have any estimation as to how many feet you were away from [defendant] when the jurors walked past her?

A. As close—closer than I am now.

Q. Would you say three or four feet?

A. Yeah, maybe five at the most.

Q. And was there an elderly woman on the jury who walked beside [defendant] who made a comment to [defendant]?

A. Yes, there was.

Q. What did that person say to [defendant]?

A. She patted her on the arm and she said I believe my daughter went to school with you.

Q. And when she patted her on the arm, did you also notice this juror's facial expression?

A. Yes. She was smiling, and just like she had just recognized her and, you know, and that they had—she was pleased that she had found out.

Apparently the juror who was described as "an elderly woman" was Ms. Baumgarden.

Defendant testified. She was asked the following questions and gave the following answers:

Q. Glada, you have heard the testimony of Mrs. Chilton?

A. Yes.

Q. Did you have any conversations with any of the jurors yourself?

A. Well, I might address, as she started out, regarding the lady that spoke with me after the verdict had been rendered. She walked past me. She put her hand on my arm and she said something to the effect did you know my daughter, maybe you went to school with her. I asked the daughter's name, I had never heard of the person before in my life. And I said

4. Briefs of both parties erroneously state the juror's name as "Baumgardner."

well, no, I guess not. And it turned out that we had gone to the same schools, different times or something together, but I had never seen the lady before, and I had never heard of her daughter before. One time when I was coming in to the courtroom or to where the jurors were seated, as I walked in I said something like well, I am late again. I didn't directly talk with any jury member. I just make that comment. I mean I could have been talking to the ceiling.

■ Nondisclosure occurs only after a clear question has been asked that is not truthfully answered. *Brines By and Through Harlan v. Cibis*, 882 S.W.2d 138, 139 (Mo. banc 1994). "[F]ailing to ask a question on voir dire waives the right to challenge the juror on any grounds not asked." *Wingate v. Lester E. Cox Medical Center*, 853 S.W.2d 912, 914 (Mo. banc 1993).

■ The jury panel was asked whether any of them knew defendant or her husband. There was no showing that Ms. Baumgarden believed she knew either of them. There was no showing of nondisclosure.

■ Plaintiffs also allege that defendant and her husband engaged in various conversations with jurors during trial. Mrs. Chilton was asked what she had observed. She stated she observed defendant and her husband converse with jurors about farming, cattle and the weather. Defendant testified she did not recall visiting with any jurors; that she made it a point not to talk to any of the jurors.

■ Contact between a party or an attorney and a juror, although improper and to be avoided, is not misconduct per se. *Knothe v. Belcher*, 691 S.W.2d 297, 299 (Mo.App.1985).[5] The record does not demonstrate a basis for a new trial. Point III is denied.

Plaintiffs' fourth allegation of trial court error asserts the trial court erred in failing to grant a mistrial because of an alleged violation during trial of an in limine order. Plaintiffs acknowledge they did not request a mistrial. They request this court "review as plain error the trial court's failure to grant a mistrial sua sponte."

■ The trial court granted plaintiffs' motion in limine. It precluded "[e]vidence of, or reference to, any collateral source of payment of Plaintiff Charles Richard Chilton's lost wages." The event at trial to which Point IV is directed was the following cross-examination of Mrs. Chilton:

Q. [by defendant's attorney] The—You and your husband haven't been out any wages?

A. Pardon me?

A general objection was made and the attorneys approached the bench. The trial transcript does not include a verbatim record of the bench conference.[6] It states:

(At this time counsel approached the bench, and the following proceedings were had:)

UNIDENTIFIED: (Inaudible). Regardless, plaintiffs acknowledge that they made no request for mistrial. The trial continued without additional reference to whether plaintiffs were "out any wages."

Plaintiffs obtained the result they sought. The subject of lost wages was not addressed by testimony. A party is not entitled to more relief than was requested. *Martin v. Durham*, 933 S.W.2d 921, 926 (Mo.App.1996); *Tobb v. Menorah Medical Ctr.*, 825 S.W.2d 638, 641 (Mo.App.1992).

■ Plain error review is rarely extended to civil cases notwithstanding that Rule 84.13(c) permits review to prevent manifest injustice or miscarriage of justice. *Brown v.*

---

5. In *Knothe v. Belcher*, 691 S.W.2d 297 (Mo.App. 1985), a new trial was granted. Plaintiffs contend this case is similar to *Knothe* and that, consistent therewith, a new trial should be granted. *Knothe* is distinguishable from this case. In *Knothe* an evidentiary hearing on the issue of juror misconduct was requested and denied. In this case there was an evidentiary hearing. It did not reveal a basis for a new trial.

6. This case was not reported by an Official Court Reporter. The "verbatim" record was made by magnetic tape recording device. That system unfortunately lends itself to incomplete transcripts in that transcribers are not always able to discern the content of poor quality recordings.

*Mercantile Bank of Poplar Bluff,* 820 S.W.2d 327, 335 (Mo.App.1991). Plaintiffs' request for "plain error" review of Point IV is refused. The judgment is affirmed.

MONTGOMERY, C.J., and SHRUM, J., concur.